UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| LANDMARK AMERICAN INSURANCE COMPANY, | § § § | |
| Plaintiff, | § § | |
| V. | § § § | CIVIL ACTION NO. _____ |
| LONERGAN LAW FIRM, PLLC and GAYLENE ROGERS LONERGAN, | § § § | |
| Defendants. | § | |

## **PLAINTIFF'S ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff Landmark American Insurance Company ("Landmark") files this Original Complaint for Declaratory Judgment and respectfully shows:

### **THE PARTIES**

1.  Plaintiff Landmark is an insurer organized under the laws of the State of Oklahoma and having its principal place of business in Atlanta, Georgia.

2.  Defendant Lonergan Law Firm, PLLC is a Texas professional limited liability company having its principal place of business in Dallas, Dallas County, Texas and may be served with process by serving its registered agent, Gaylene Rogers, 12801 N. Central Expressway, Suite 150, Dallas, Texas 75243. Gaylene Rogers is the sole member and director and has her domicile in Dallas, Dallas County, Texas.

**PLAINTIFF'S ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT—Page 1**

3. Defendant Gaylene Rogers Lonergan is an individual having her domicile in Dallas, Dallas County, Texas and may be served at her place of business, 12801 N. Central Expressway, Suite 150, Dallas, Texas 75243, or wherever she may be found.

## JURISDICTION

4. The Court has jurisdiction over this matter under the Declaratory Judgment Act, 28 U.S.C. § 2201, and upon complete diversity of citizenship pursuant to 28 U.S.C. § 1332. This is a civil action and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Jurisdiction is also proper because the issues presented in this suit are ripe for adjudication. A decision on these issues will directly affect underlying litigation involving Defendants.

## VENUE

5. Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(a)(1) because Defendants are located and do business in the Northern District of Texas and have been sued in a lawsuit pending in the 17th Judicial District Court of Tarrant County, Texas in the Fort Worth Division.

## BACKGROUND

6. This matter is brought to determine Landmark's rights and obligations under a Lawyers Professional Liability Policy issued to Lonergan Law Firm, PLLC with respect to claims brought against Lonergan Law Firm, PLLC and Gaylene Rogers Lonergan (collectively "Lonergan") in the matter styled *Christopher Dillon Snell, et al. v. N & J Enterprise, LLC, et al.*, No. 17-279460-15, in the 17th Judicial District Court of Tarrant County, Texas (the "Underlying Lawsuit").

7. The live pleading is Plaintiffs' Fifth Amended Petition. Plaintiffs in the Underlying Lawsuit sued Lonergan and others contending that Plaintiffs loaned $4,600,000 to finance a real estate transaction that was secured with mostly nonexistent collateral. While Plaintiffs attempted to mitigate their damages, Plaintiffs allege that their outstanding damages amount to approximately $1,700,000 plus interest, costs and fees.

8. According to Plaintiffs, in Spring 2015, KJM Capital Group ("KJM") presented Plaintiffs with an investment opportunity in the form of a loan to N & J Enterprise, LLC ("N & J"). N & J purportedly was to use the loan proceeds to purchase real property in Dalworthington Gardens, Texas. After N & J failed to make payments, Plaintiffs allegedly learned that the entire loan transaction was a scam and that nearly all of the collateral N & J provided for the loan was bogus.

9. In September 2008, Plaintiffs maintain T.N. Frasier conveyed the property to N & J, while a receiver representing Frasier's wife in their divorce also conveyed the property to Kenyon Martin. Plaintiffs assert that Martin improved the property and moved his family there. Based upon public documents, Martin and N & J both claimed to be the rightful owners of the property and initiated litigation to clarify title. According to Plaintiffs, Martin and N & J supposedly reached an agreement to deposit all funds generated by the mineral estate of the property in a Bank of America, NA escrow account. After years of litigation, Martin and N & J purportedly reached a settlement contingent upon N & J buying out Martin's interest. Thereafter, Plaintiffs allege that N & J and its principal, Jonathan Blount, began looking for investors that would finance the deal through a short-term loan. On or about January 3, 2015, Blount, through his attorney, allegedly received an appraisal on the property estimating its value at $14,600,000.

10. In or around April 2015, Plaintiffs contend that KJM (and others) agreed to help find investors. KJM allegedly approached Plaintiffs to invest. Plaintiffs allege that the funds to be advanced were based on the representations of N & J and Blount of certain rights Plaintiffs would be granted and security interests in a variety of assets, including the property. KJM purportedly handled the arrangements for Plaintiffs. According to Plaintiffs, KJM presented Plaintiffs with a secured promissory note executed by N & J, an escrow agreement concerning the Bank of America, NA escrow account, an assignment of rights and instruction for distribution of the escrow account, a deed of trust securing the property supported by a title commitment, an unconditional guaranty agreement, and an assignment of rights and interests from N & J to the proceeds of an unrelated real estate sale. Lonergan and others allegedly assured Plaintiffs that all of the security for the transaction was properly documented and executed.

11. When presenting the investment opportunity, Plaintiffs contend that KJM represented to Plaintiffs that it would invest a significant amount along with Plaintiffs. KJM allegedly also agreed with Blount and N & J that KJM would secure financing in amounts far exceeding the intended purchase price of the property. In particular, Plaintiffs maintain that N & J had agreed to pay Martin $4.5 million for the property, but sought to borrow $7 million from KJM and Plaintiffs, which would have allowed Blount to pocket $2.5 million after paying Martin for the property. Shortly before closing, Plaintiffs assert that KJM informed Blount and N & J that it would not advance any of its funds, which was not disclosed to Plaintiffs until long after closing.

12. The note payable by N & J matured on June 4, 2015, and Plaintiffs contend that Blount, N & J, and KJM told Plaintiffs that a purported re-finance was scheduled on that date,

and the payoff of the note would be made. Plaintiffs allege that the re-finance was scuttled and payment was never made. After it became clear that N & J was not going to pay, Plaintiffs assert that they attempted to their enforce rights with respect to the purported security that N & J had put up as collateral. With respect to the Bank of America escrow account, Blount and N & J allegedly had represented that the account contained almost $5,000,000 and was being held in escrow by Edward Eddyenton, III pursuant to an escrow agreement between Eddyenton and N & J. The assignment of rights and instructions for distribution had purportedly assigned N & J's rights to Plaintiffs. As it turned out, Eddyenton was nonexistent and was an alias for Blount. Plaintiffs allegedly also learned that the escrow account never contained the millions of dollars represented by Blount, N & J, and "Eddyenton," but had never had a balance exceeding $500 and was closed.

13. According to Plaintiffs, Blount was a career criminal who has served many years in federal, Texas and Oklahoma prisons for similar theft felonies and real estate scams. Plaintiffs contend that Lonergan and Maverick Title of Texas, LLC (another defendant) ("Maverick Title") were aware of Blount's extensive criminal history at the time they assisted Blount in obtaining the $4.6 million loan from Plaintiffs.

14. Plaintiffs allege that they would not have entered into the transaction absent the negligence of Maverick Title and Lonergan. Plaintiffs contend that Maverick Title and Lonergan negligently performed closing the loan. Lonergan, according to Plaintiffs, notarized the signature page on the assignment of rights and instructions for distribution for the escrow account, stating that Lonergan witnessed "Eddyenton" sign that agreement in her presence. Plaintiffs maintain that it was only after N & J defaulted on the note that Lonergan admitted she had never seen "Eddyenton." Additionally, Plaintiffs allege that Lonergan notarized an assignment of N & J's

rights from the unrelated real estate transaction purportedly representing collateral for the loan despite knowing that N & J had no such rights. According to Plaintiffs, Lonergan and Maverick Title never disclosed these material facts to Plaintiffs.

15. When Plaintiffs allegedly lost the other security interests, Plaintiffs initiated foreclosure on the property pursuant to the deed of trust, only to find out that the deed of trust inaccurately described the property, resulting in their ability to recover about $2,900,000 of the $4,600,000 loan.

16. Based upon the foregoing allegations, Plaintiffs state a claim for negligence against Maverick Title and Lonergan based upon their duties as title agents and/or closers for the loan transaction. Plaintiffs further contend that Lonergan was negligent during the course and scope of her employment for Maverick Title and that Lonergan was an agent or apparent agent of Maverick Title. Plaintiffs also state a claim for negligent misrepresentation against Lonergan and Maverick Title. Alternatively, Plaintiffs contend that Lonergan violated the Texas Securities Act. Plaintiffs also state a claim against Lonergan for fraud or alternatively, fraud by nondisclosure. Plaintiffs further state a claim, alternatively, for gross negligence, aiding and abetting, and conspiracy. Plaintiffs seek actual and exemplary damages from Lonergan.

17. Maverick Title also filed a cross-claim for indemnity against Lonergan. The cross-claim is based upon a contractual indemnity provision in the Closing Services Agreement between Lonergan and Maverick Title.

18. Plaintiffs' First Amended Petition adding Lonergan to the Underlying Lawsuit was filed on July 30, 2015. Plaintiffs' First Amended Petition was served on Lonergan on August 4, 2015. Lonergan first requested "coverage" for the claims in the Underlying Lawsuit from Landmark on March 12, 2017.

**PLAINTIFF'S ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT—Page 6**

2680779v2
08011.539

## **THE LANDMARK POLICIES**

19. Landmark issued Lawyers Professional Liability Policy no. LHR751104 to Lonergan for the period 5/8/2015 to 5/8/2016 (the "2015 Policy"). Landmark issued Lawyers Professional Liability Policy no. LHR757328 to Lonergan for the period 5/8/2016 to 5/8/2017 (the "2016 Policy"). Each policy is written on a claims-made and reported basis, with a Retroactive Date of 5/8/2014. Each policy includes a $1,000,000 each claim limit and a $1,000,000 aggregate limit.

20. The insuring agreement of the policies provides:

**Part I.  Insuring Agreement**

    **A.   Covered Services**

The Company will pay on behalf of the Insured, as shown in the Declarations, all sums that the Insured becomes legally obligated to pay as **Damages** and associated **Claim Expenses** arising out of a negligent act, error or omission . . . even if the **Claim** asserted is groundless, false or fraudulent, in the rendering of or failure to render professional services as a Lawyer, provided that the:

1. **Claim** is first made against the Insured during the **Policy Period**, and reported to the Company no later than thirty days after the end of the **Policy Period**.

2. Negligent act, error or omission . . . took place in a covered territory.

3. Negligent act, error or omission . . . took place after the **Retroactive Date** as shown in the Declarations.

    **B.   Defense and Settlement**

The Company will have the right and the duty to defend any **Claim** against an Insured seeking **Damages** to which this policy applies, even if any of the allegations of the **Claim** are groundless, false or fraudulent. The Company's right and duty to defend any **Claim** shall end when the Company's Limit of Liability has been exhausted by payment of **Damages** and/or **Claim Expenses**, or has been tendered to the Insured or to a court of competent jurisdiction.

21. The policies also include the following exclusions:

**Part II. Exclusions**

This policy does not apply to any Claim or Claim Expenses based upon or arising out of:

    **A.**   Actual dishonest, fraudulent, criminal, intentionally wrongful or malicious act, error, or omission committed by any Insured. However, this Exclusion shall not

    apply unless the dishonest, fraudulent, criminal, intentionally wrongful or malicious act, error or omission is established or proven by:

    1. an admission by any insured; or

    2. a finding, determination, or ruling, order or judgment in a judicial, administrative or arbitration proceeding.

* * *

**J.** Any obligation or liability assumed by the Insured under any contract or any written agreement, unless liability would have attached in the absence of such a contract or agreement.

* * *

**L.** The notarization of a signature without the physical appearance of the signator before the Insured.

* * *

**V.** Any **Claim** or litigation against any Insured occurring prior to, or pending as of the inception date of this Policy, including (but not limited to), **Claims**, demands, causes of action, legal or quasi-legal proceedings, decrees, or judgments; or any subsequent litigation or **Claims** arising from or based on substantially the same matters as alleged in the pleadings of such prior litigation; or any act, error, omission . . . of any Insured(s) which gave rise to such prior or pending litigation or **Claims**.

22. The policies define the following terms:

**Part III. Definitions**

  **B.** **Claim** means a written demand for monetary or non-monetary relief received by the Insured during the Policy Period, including the service of suit . . .

  **C.** **Claim Expense** means expenses incurred by the Company or the Insured with the Company's consent in the investigation, adjustment, negotiation, arbitration, mediation and defense of covered **Claims**, whether paid by the Company or the Insured with the Company's consent, and include:

    1. Attorney fees;

    2. Costs assessed against the Insured in any **Claim** defended by the Company;

    3. Interest on the full amount of any judgment that accrues after the entry of the judgment and before the Company has paid, offered to pay or deposited in court the part of the judgment that is within the applicable Limit of Liability;

    4. The cost of appeal bonds or bonds to release attachments, but only for bond amounts within the available applicable policy limit, and only if said **Claims** are covered by the Policy;

        5.     Reasonable expenses incurred by the Insured at the Company's request other than:

            a.     Loss of earnings;

            b.     Salaries or other compensation paid to the Insured or any employee of the Insured.

    **D.**     **Damages** means monetary judgment, award or settlement, except those for which insurance is prohibited by law. **Damages** does not include punitive or exemplary damages, fines, penalties, sanctions, taxes, awards, or amounts that are multiples of any covered **Damages**, disputes over fees, deposits, commissions or charges for goods or services.

    **E.**     **Policy Period** means the period of time stated in the Declarations, or any shorter period resulting from policy cancellation or amendment to the Policy.

* * *

    **H.**     **Retroactive Date** means the date stated in the Declarations on or after which any alleged or actual negligent act, error or omission . . . must have first taken place in order to be considered for coverage under this Policy.

23.     The policies also include the following condition:

**Part IV. Conditions**

    **A.**     Notice of Claim

    The Insured must notify the Company as soon as practicable of an incident, occurrence or offense that reasonably be expected to result in a **Claim**. Where notice to the Company of such incidents, occurrences or offenses has been acknowledged as adequate by the Company in writing, subsequent **Claims** derived from such incidents, occurrences or offenses will be deemed to have first been made at the time the incident, occurrence or offense giving rise to such **Claim** was first provided. The Insured also must immediately send copies to the Company of any demands, notices, summonses or legal papers received in connection with any **Claim**, and must authorize the Company to obtain records and other information. . . .

## **DECLARATORY RELIEF SOUGHT**

24.     Landmark does not owe Lonergan a duty to defend the claims in the Underlying Lawsuit. Landmark's policies are "claims made and reported" policies. Lonergan was served with Plaintiffs' First Amended Petition on August 4, 2015. The 2016 Landmark Policy incepted on May 8, 2016. Accordingly, Lonergan failed to meet the terms of the 2016 Policy's insuring agreement requiring that the claim be *first made against the Insured during the policy period.*

Additionally, Lonergan failed to "immediately" provide a copy of the suit and summons, violating the 2016 Policy's notice condition. Similarly, Lonergan failed to meet the terms of the 2015 policy requiring the claim be *reported to the Company no later than thirty days after the end of the **Policy Period***," or June 7, 2016. Moreover, Lonergan failed to "immediately" provide a copy of the suit and summons, violating the 2015 Policy's notice condition.

25. Even assuming the insuring agreement of the 2016 Policy was met and the notice condition was not violated, Exclusion V. bars coverage for the claims asserted against Lonergan. Exclusion V. provides that the policy does not apply to litigation against any insured pending as of the inception date of this policy. As mentioned above, Lonergan was added as a party on July 30, 2015 and served on August 4, 2015, and, therefore, the litigation was pending against Lonergan prior to the inception date of the policy, May 8, 2016.

26. Additionally, Exclusion L. in both the 2015 Policy and 2016 Policy bars coverage for claims based upon or arising out of the notarization of a signature. According to Plaintiffs, Lonergan notarized the signature page on the assignment of rights and instructions for distribution for the escrow account, stating that Lonergan witnessed "Eddyenton" sign that agreement in her presence. Plaintiffs contend that Lonergan admitted she had never seen "Eddyenton." Plaintiffs also allege that Lonergan notarized an assignment of N & J's rights from the unrelated real estate transaction purportedly representing collateral for the loan despite knowing that N & J had no such rights. Given these allegations, Exclusion L. precludes coverage to Lonergan. And, based on these same allegations, Exclusion A. in the 2015 Policy and 2016 Policy, bars coverage for actual dishonest, fraudulent, criminal, intentionally wrongful or malicious act, error, or omission committed by any Insured, applies.

27. Exclusion J. in the 2015 Policy and 2016 Policy precludes coverage for Maverick Title's cross-claim against Lonergan for contractual indemnity.

28. Because Lonergan failed to meet the requirements of the insuring agreement and/or exclusions apply to bar coverage, Landmark has no duty to defend Lonergan. Because the factual allegations against Lonergan negate Landmark's duty to defend, the factual allegations likewise negate any possibility Landmark will ever have a duty to indemnify.

## **PRAYER**

THEREFORE, Landmark requests that the Court enter a declaratory judgment that Landmark has no duty to defend or indemnify Lonergan in the Underlying Lawsuit.

Respectfully submitted,

/s/ J. Richard Harmon
    J. Richard Harmon
    State Bar No.  09020700
    Jo Allison Stasney
    State Bar No.  19080280

THOMPSON, COE, COUSINS & IRONS, L.L.P.
Plaza of the Americas
700 N. Pearl Street, Twenty-Fifth Floor
Dallas, TX 75201-2832
Telephone:  (214) 871-8200
Telecopy:  (214) 871-8209

COUNSEL FOR LANDMARK AMERICAN INSURANCE COMPANY